UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 11-7 RECORDING CORP. D/B/A BETTER NOISE MUSIC, a California corporation; KOVAC MEDIA GROUP, INC. D/B/A 10TH STREET ENTERTAINMENT, a California corporation; and FIVE NINETEEN MUSIC PUBLISHING, INC., <br><br> Plaintiffs, <br><br> -against- <br><br> THOMAS P. CUMMINGS P/K/A TOMMY VEXT, <br><br> Defendant. | Case No. <br><br> **COMPLAINT** <br><br><br><br> [JURY TRIAL DEMANDED] |

## COMPLAINT

Plaintiffs 11-7 Recording Corp. d/b/a Better Noise Music ("Better Noise Music"), Kovac Media Group, Inc. d/b/a 10th Street Entertainment ("10th Street Entertainment"), and Five Nineteen Music Publishing, Inc. ("5-19"), through their undersigned counsel, for their Complaint against Defendant Thomas P. Cummings p/k/a Tommy Vext ("Defendant" or "Vext"), respectfully allege as follows:

## NATURE OF THE ACTION

1.      This action arises from Vext's retaliatory scheme to infringe on Plaintiffs' copyrights, breach his obligations under three exclusive personal service agreements, and sabotage the release of the hotly-anticipated third album of the rock band Bad Wolves.

2.      Vext is the former lead singer and co-founder of Bad Wolves ("Bad Wolves" or the "Band").  Better Noise Music is Bad Wolves' record label.  5-19 is the Band's music publisher.  10th Street Entertainment is the band's entertainment manager.

3.      In 2017, Vext and the other co-founder of Bad Wolves entered into contracts with Plaintiffs to receive a broad array of services.  Under these contracts, the Band released two

critically acclaimed and commercially successful albums and was, by Vext's own admission, on an upward trajectory with multiple hit singles.

4.      That all came crashing down for Vext during the COVID-19 pandemic.  Under various stay-at-home orders, Vext became "radicalized" by the fringe right-wing movement and became an ardent QAnon supporter.

5.      Vext did not hide his polarizing opinions.  He voiced them on social media and through other Internet outlets.  Given that he was the lead singer of a prominent rock band, his comments were widely disseminated and created significant controversy.

6.      Making matters worse, Vext became unhinged.  His ex-girlfriend filed for a domestic violence restraining order, claiming that Vext physically assaulted her numerous times and that she was afraid for her life.  These claims were, and are, very serious, and they significantly tarnished Vext's image and reputation.

7.      This combination of negative press, public outrage and serious domestic violence allegations was bad for Vext, but it also damaged the Band and its other members.  The perception was that the other members of Bad Wolves shared Vext's views and they were viewed as guilty by association.

8.      Allen Kovac, as Bad Wolves and Vext's manager, tried to help Vext repair his image and get his career back on track.  But Vext would not listen to reason.  He grew more and more paranoid and believed that ominous, unnamed forces were trying to "cancel" him and he needed to fight back.  This only made things worse.

9.      Finally, Vext decided that he needed to quit the Band for the sake of his own career.  In his official statement, which he posted on Instagram, Vext thanked Plaintiffs for all of their work to make Bad Wolves a success, and he wished his former band members the best in their search for a new lead singer.

10.     But after making this apparently magnanimous gesture, Vext changed his mind. Motivated by greed and his oversized ego, Vext claimed that he owns Bad Wolves and has a right to block the remaining members from recording and releasing music under the name Bad Wolves.  Vext also claimed that Plaintiffs had no right to use the name Bad Wolves to market and promote Bad Wolves' prior albums, and upcoming third album, or to otherwise market and promote the Band, such as through tour promotions and merchandise sales.

11.      Vext does not have these rights.  While represented by sophisticated counsel, Vext signed contracts that grant Plaintiffs the right to use the name Bad Wolves to market and promote the Band and its music, and that give Better Noise Music ownership of the copyrights in Bad Wolves' recordings and music videos.

12.     In an attempt to gain leverage over Plaintiffs and the band, Vext has resorted to actively sabotaging the Band by posting unreleased music videos and sound recordings without permission.

13.     Vext's retaliatory conduct is getting worse by the day.  Now, he is promoting his own "tour" using the confusingly similar name "B@D W8LV3S" in a blatant attempt to confuse concertgoers into thinking this is an approved tour.

14.     Under the agreements he signed, Vext is prohibited from recording new music, writing new music, and exploiting existing master recordings and videos, without Plaintiffs' prior consent.  These are standard terms in the music industry, and they are designed to protect record labels and music publishers from disgruntled artists who aim to undermine the significant investment of time and money that record labels and publishers undertake.

15.     Vext is also prohibited from using Plaintiffs' copyrighted sound recordings and music videos, and he is certainly prohibited from generating revenue from posting content that features Plaintiffs' copyrighted recordings.  And yet, that is exactly what Vext is doing.

16.     By this action, Plaintiffs seek declaratory relief to resolve the parties' disputes regarding their rights and obligations under the agreements, as well as equitable relief to stop Vext's infringements and his other illegal conduct.

## THE PARTIES

17.     Plaintiff Better Noise Music is a California corporation with its principal place of business in New York, New York.

18.     Plaintiff 10th Street Entertainment is a California corporation with its principal place of business in New York, New York.

19.     Plaintiff 5-19 is a New York corporation with its principal place of business in New York, New York.

20.     On information and belief, Defendant Vext is an individual who currently resides in Los Angeles, California.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, and 1338(a) because Plaintiffs assert claims arising under the U.S. Copyright Act, 17 U.S.C. §§ 101 *et seq.*  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because such claims form part of the same case or controversy.

22.     Jurisdiction and venue are proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and because Vext signed contracts that are at issue in this dispute that contain New York forum selection clauses providing that venue is proper in this judicial district.  The New York forum selection clauses are found in Section C-17(e) of the Exclusive Recording Agreement dated August 31, 2017 (the "Recording Agreement"), Section 8.3 of the Co-Publishing Agreement dated August 31, 2017 (the "Publishing Agreement"), and Section 20(b)

4

of the Personal Management Agreement dated August 31, 2017 (the "Management Agreement").[1]

## FACTUAL ALLEGATIONS

### A.   Background

23.   Allen Kovac ("Kovac") is a prominent talent manager who has managed a wide range of artists in his 40-year career.  His clients have included Blondie, The Cranberries, EnVogue, The Bee Gees, Steven Tyler, Mötley Crüe, Meatloaf, and many others.

24.   Kovac is the founder and owner of Kovac Media Group, Inc., which does business as 10th Street Entertainment, and is a leading entertainment management company that provides marketing and promotional services for musicians and other artists.

25.   Kovac is also the founder and owner of the independent recording company 11-7 Recording Corporation, which now does business under the name Better Noise Music.  Over the years, Better Noise Music has grown into a leading content company that creates music, books, films, documentaries, theatrical productions, tours, and television entertainment, while still staying true to its indie label roots.  It has a deep roster of chart-topping rock bands and artists, including Mötley Crüe, Five Finger Death Punch, Dirty Heads, AWOLNATION, and Asking Alexandria, among many others.

26.   Kovac is also the founder and owner of Five Nineteen Music Publishing, Inc. ("5-19"), which is a music publishing company that assists musicians with the exploitation of their sound recordings/compositions and the collection of revenue derived therefrom.

### B.   Bad Wolves Enters Into Agreements With 10th Street, Better Noise And 5-19

27.   Bad Wolves is a rock band founded in 2017 by lead singer Vext and drummer

---

[1] Vext improperly filed an action in California state court against Plaintiffs and asserted claims that arise under these contracts in violation of the forum selection clauses contained therein. Plaintiffs are moving to dismiss the California action because it was filed in the wrong forum.

John Boecklin ("Boecklin").

28.     That same year, Vext and Boecklin entered into management, recording and

publishing agreements with 10th Street Entertainment, Better Noise Music and 5-19,

respectively.  Vext and Boecklin were represented by sophisticated counsel from Mitchell,

Silberberg & Knupp LLP in connection with these agreements.

29.     The terms of these agreements are set forth in three separate contracts:  the

Recording Agreement; the Publishing Agreement; and the Management Agreement, attached

hereto as **Exhibits A**, **B** and **C**, respectively, and incorporated herein.

### 1.     Vext Agreed to Exclusively Record Music for Better Noise Music

30.     In executing the Recording Agreement, Vext agreed that he would exclusively

record music for Better Noise Music during the term of the contract, i.e., "[Vext] hereby agrees

to render [his] services as a recording artist *exclusively* for [Better Noise Music], and [Vext]

hereby grants to [Better Noise Music] the *exclusive* right to embody [his] performances in master

recordings, throughout the Territory for the duration of the Term."  (Recording Agreement, § 1

(emphasis added).)

31.     The only exception under the contract to the exclusivity is Section 14, which

states that Vext has the right to perform as a "background vocalist or background

instrumentalist" subject to certain limitations, including that Vext cannot use his name or the

name Bad Wolves, or his picture, portrait or likeness, to promote or market such side projects.

32.     This exclusive recording restriction does not expire until after Bad Wolves

delivers all of the albums under the contract.  The Recording Agreement is a five-album deal that

grants Better Noise Music the option for the last four albums.  Bad Wolves has delivered the first

two albums, *Disobey* (2018) and *N.A.T.I.O.N.* (2019), and Better Noise Music has exercised its

option for the upcoming third album.  The Recording Agreement therefore remains in effect, and

Vext is bound by its terms.

33.     In Section C-8 of the Recording Agreement, Vext expressly acknowledged that his services pursuant thereto "are of a special, unique and intellectual character which gives them peculiar value, and that in the event of a breach by Artist of any term, condition or covenant hereof, Company may be caused irreparable injury."

34.     Pursuant to Section C-17(e), the Recording Agreement is governed by New York law and contains a New York forum selection clause.

### 2.    Vext Agreed That 5-19 Would Be His Exclusive Publisher

35.     Per the Publishing Agreement, Vext agreed that he would exclusively compose music for Bad Wolves during the term of the contract, and that 5-19 would be the exclusive publisher for his compositions.  In Section 7.3, Vext represented, warranted, covenanted and agreed that he "will write musical compositions and scores exclusively for [Boecklin and Vext] during the Term of this Agreement, inclusive, without limitation, of such works written for [Bad Wolves'] recording projects as well as works written for others.  Publisher's rights shall extend to such works written by [Boecklin and Vext], jointly and severally."

36.     Vext agreed to this exclusive songwriting restriction and exclusive publishing provision on behalf of himself individually and collectively as a member of Bad Wolves.

37.     The Publishing Agreement remains in effect, and Vext remains bound by its terms.

38.     Pursuant to Section 8.3, the Publishing Agreement is governed by New York law and contains a New York forum selection clause.

### 3.    Vext Agreed to Pay Management Commissions to 10th Street Entertainment

39.     In exchange for 10th Street Entertainment's management services, Vext agreed to pay management commissions on the revenue generated from all of his work in the

entertainment industry, including music performances, songwriting, publishing and all such music industry work, pursuant to Section 5 of the Management Agreement.

40.     Per Section 20(b), the Management Agreement is governed by New York law and contains a New York forum selection clause.

### C.     Vext Voluntarily Quits Bad Wolves

41.     From 2017 to 2020, Bad Wolves released two albums under the Better Noise Music label, and these albums were critical and commercial successes.  The first album, *Disobey*, peaked at No. 23 on the *Billboard* 200.  One of the singles on that album, "Zombie," topped the U.S. *Billboard* Mainstream Rock chart for three weeks in 2018.  Another single, "Remember When," spent 24 weeks on the *Billboard* Mainstream Rock chart, reaching the top spot in July 2019.

42.     The second album, *N.A.T.I.O.N.*, was ranked on the *Billboard* 200 for several weeks, with two singles from that album, "Sober" and "Killing Me Slowly," both reaching the top position on the U.S. *Billboard* Mainstream Rock chart at different times in 2020.

43.     The band's career, and Vext's career in particular, were on an upward trajectory. Vext had been in a number of unsuccessful bands over the years and had never succeeded in his music career until he began working with Better Noise Music and 10th Street Entertainment. Through repeated efforts, Better Noise Music and 10th Street Entertainment gave him more opportunities than he had ever had.

44.     But during the lockdowns necessitated by the COVID-19 pandemic, Vext's personal life, and the troubles arising therefrom, began to seriously threaten his career.

45.     In April 2020, Vext's ex-girlfriend, Whitney Johns, filed a Request for Domestic Violence Restraining Order against him in Los Angeles Superior Court.  In her supporting declaration, Ms. Johns stated that Vext physically assaulted her several times between January 1,

2020 and April 11, 2020.  She stated that Vext hit her in the face, threw water in her face and choked her on multiple occasions.  She stated that Vext knows where she lives and that she is terrified for her life.  Following a five-day evidentiary hearing, the court granted a two-year domestic violence restraining order against Vext.

46.     This was not the first time Vext was accused of physical violence.  In April 2019, Bad Wolves' guitar player, Doc Coyle ("Coyle"), contacted the Yellowstone County Sheriff's Office in Billings, Montana to report that Vext physically assaulted him on the band's tour bus while on tour.  Coyle reported that Vext struck him in the face causing a visible open cut on the inside of Coyle's mouth, and then Vext took him to the ground.  Coyle also reported that Vext was taking steroids and physically threatening the band members.

47.     Vext became radicalized during the pandemic and is now a full-blown QAnon supporter and a true believer of numerous right-wing conspiracy theories and hoaxes.  He frequently appears on fringe podcasts to broadcast his extreme views, and he posts right-wing content online through his social media accounts.

48.     Kovac, as Vext's manager, tried to persuade him that, from a commercial and marketing perspective, his recent public statements and the domestic violence accusations could result in significant financial harm to Bad Wolves and jeopardize the Band as well as Vext's career.  Kovac counseled that, in Kovac's opinion based on his decades of experience in the music industry, Vext should consider toning down his inflammatory rhetoric and laying low given the seriousness of the domestic violence accusations.  Kovac tried to help Vext navigate his way through his personal troubles both as a concerned advisor and as a manager and businessman who wanted to see Bad Wolves and Vext continue to succeed.

49.     Vext rejected Kovac's advice and made his own decision that the best course of action for his career was to quit the band.

50.     On January 12, 2021, Vext posted on Instagram through his verified account Tommy Vext [@tommyvext] a video in which he read his official statement regarding his departure from the band.  The video is over 12 minutes long.  In his statement, Vext expresses a "huge debt of gratitude to all the fans, all the people at the label, the management, and everyone who helped in establishing my band Bad Wolves' career."

51.     He went on to say that Bad Wolves' "future was bright, and our trajectory was undeniable, until Covid struck and changed all our lives.  I saw things happening that I didn't understand.  During the first quarantine I publicly voiced my concerns about where we are going as a nation and what is happening to America, the country I love."

52.     Vext recognized that his public comments during the pandemic caused controversy and negative reactions from people on social media who he thought were trying to "cancel" him.  In his statement, Vext stated that he realized that "this is my fight.  I cannot drag my band members and people around me into this.  I, on my own, decided to go solo.  This way everything I say and do will affect only me."

53.     Vext acknowledged that Bad Wolves would have to find a new lead singer to finish recording the third album and move forward with the Band's career.  In his statement, Vext wished the band members the best, said that there will be "healthy competition" and "I can't wait to hear what comes out of them musically."

54.     In response to Vext's statement, Plaintiffs continued to support Vext and this new direction that he decided to take with his music career.  Better Noise Music exercised its Leaving Member Option per Section C-16 of the Recording Agreement, which permits Vext to record music on his own but only for Better Noise Music pursuant to an exclusive recording provision.

55.     5-19 also exercised its Leaving Member Option per Section 9.2 of the Publishing Agreement, which similarly permits Vext to compose music on his own but that 5-19 remains the

exclusive music publisher.

    **D.**      **Vext Retaliates Against Plaintiffs And His Former Band Members**

56.    After issuing his statement, Vext changed his mind.  He now claims that the Management Agreement, Recording Agreement, and Publishing Agreement are or should be terminated, that Plaintiffs' respective rights and benefits under the agreements, including Plaintiffs' rights in, and use of, the band name "Bad Wolves" and other intellectual property, including music and related assets, should be released and awarded to him.

57.    Vext also now claims that his former band members cannot record the third album without him and that Better Noise Music is violating his rights by supporting the Band and helping them finish the third album.  These claims are false and contrary to the terms of the contracts that he voluntarily executed while represented by legal counsel.

58.    Vext also claims that he alone owns the name "Bad Wolves" and that he alone owns, or otherwise has a right to control, master recordings, compositions, music videos, artwork and related assets that were created and released while he was an official member of the Band. He claims that he has the right to block the Band from recording music, releasing music videos to promote the album and otherwise market and promote the album.

59.    This too is false and contradicted by the express terms of the Recording Agreement and Publishing Agreement that he voluntarily signed while represented by counsel. The Recording Agreement states:  "Artist hereby grants to [Better Noise Music] the worldwide right in perpetuity to use and to permit others to use Artist's name, approved likeness, other approved identification, and approved biological material concerning Artist, and the name and likeness of any record producer rendering services in connection with the Masters, in connection with the Music Videos, the Masters, the phonograph records derived therefrom, [Better Noise Music] or its designee's record business, and Artist's career, in accordance with the terms hereof.

As used herein, Artist's 'name' shall include, without limitation, all past, present and future professional names used by Artist as a group and all past, present and future legal and professional names used by each member of Artist. . . . The rights granted to [Better Noise Music] pursuant to this paragraph with respect to Artist's name, likeness, other identification and biographical material concerning Artist shall be exclusive during the Term hereof and non-exclusive thereafter."  (Recording Agreement, § C-5.)

60.     But Vext has done far more than create significant controversies under these agreements.  He is actively and intentionally undermining the band's release of its new album by leaking and otherwise broadcasting without permission master recordings and music videos that are owned by Better Noise Music.  His conduct violates the Copyright Act and the express provisions of the Recording Agreement and Publishing Agreement.

61.     Under Section 13 of the Recording Agreement, Better Noise Music is the sole owner of the copyrights—whether under the work-for-hire doctrine or by assignment—in Bad Wolves' sound recordings and music videos.

62.     As the copyright owner, Better Noise Music has the exclusive right to publish, distribute, copy, or otherwise exploit the recordings and videos.

63.     Vext has repeatedly infringed Better Noise Music's copyrights by posting recordings and videos online without authorization, including on Instagram and the private website "OnlyFans."  Vext also published videos on Facebook Watch, Instagram, and YouTube.com that feature the copyrighted master recordings owned by Better Noise Music.

64.     Below is a chart listing the copyrighted recordings (the "Cover Songs") that Vext has infringed:

| Song | Copyright Registration # | Site |
|------|--------------------------|------|
| Wrecking Ball | SRu 1-470-983 | YouTube, Instagram |
| Bad Romance | SRu 1-470-983 | Facebook Watch |
| Hunger Strike | SRu 1-470-983 | Instagram |

| Tennessee Whiskey | SRu 1-470-983 | Instagram |
|---|---|---|
| Look What You Made Me Do | SRu 1-470-983 | Instagram |
| Cry Me A River | SRu 1-470-977 | Instagram |
| Bitch Better Have My Money | SRu 1-470-977 | Instagram |
| Look At Me Now | SRu 1-470-977 | Instagram |
| The Hills | SRu 1-470-977 | Instagram |
| Hollywood's Bleeding | SRu 1-470-977 | Instagram |
| Crawling | SRu 1-470-977 | Instagram |
| Everybody Wants To Rule The World | SRu 1-470-977 | Instagram |
| Video Games | SRu 1-470-974 | Instagram |
| Heart Shaped Box | SRu 1-470-974 | Instagram |

65.     Plaintiffs have had to issue take down notices to stop Vext's conduct, but he persists in infringing Plaintiffs' copyrights and violating their rights under the Agreements.

66.     Vext also posted an unreleased music video that features the copyrighted master recording of the song "Better Off This Way (ft. Dorothy)."   Better Noise Music has registered its sound recording copyright with the U.S. Copyright Office under the registration number SRu 1-470-946.

67.     Plaintiffs' investigation is ongoing, and it is expected that the investigation will reveal more copyright infringement and wrongful conduct.

68.     Vext's infringements and contract breaches are knowing, intentional and malicious.  Vext has attempted to conceal his wrongful conduct by posting the infringing videos on Instagram's "Stories" feature, where the videos expire and are undiscoverable by Better Noise Music twenty-four hours after they appear.  He also posts the infringing videos behind paywall websites like OnlyFans.

69.     On August 4, 2021, Vext was featured on the "Gut Check Uncut" podcast.  Vext admitted that his desire was to get out from under his contractual obligations to Plaintiffs.  Vext also revealed on the "Pardon My American" podcast that his goal is to get out from under his

contractual obligations.

70.    His conduct is getting worse by the day.  He is now promoting his own tour using his name Tommy Vext and a band name that is confusingly similar to Bad Wolves, i.e., the "B@D W8LV3S," as shown below:



71.    Plaintiffs did not authorize Vext to market his new band as "Tommy Vext and the B@D W8LV3S," which is a blatant attempt by Vext to profit off of the name, reputation and good will associated with the name Bad Wolves and to unfairly compete against Plaintiffs and his former band members.

72.    Plaintiffs' investigation is ongoing, but continues to uncover more examples of Vext's unfair competition and bad faith conduct.  Below is an example of promotional material regarding a recent performance by "Tommy Vext of Bad Wolves":



73.    Vext also recently posted the below promotional material on his Instagram page,

marketing himself and his new band as "Tommy Vext and the B@D W8LV3S":



74.    Vext knows that he is not permitted to do this.  Last year, Better Noise Music

gave Bad Wolves permission to post approved content, including cover songs, to the subscription site Patreon so the Band could earn additional money during the pandemic since the Band could not earn money from touring.

75.     It came to Better Noise Music's attention that Vext had exceeded the scope of this accommodation by posting various unapproved Cover Songs.

76.     Better Noise Music told Vext to stop, and explained to him that the Cover Songs are exclusively owned by Better Noise Music per the Recording Agreement and that these songs must remain unreleased except as expressly permitted by the label.   Vext did not listen.

77.     After announcing his departure from Bad Wolves, Vext launched a GoFundMe page to raise funds to help recover recording costs he allegedly incurred in connection with recordings featuring Vext covering songs by other artists in addition to other "new" recordings to release as a solo artist.  This GoFundMe campaign was, and is, unauthorized and unapproved.

78.     To solicit funds for his "new" cover album and solo career, Vext promised fans that he would give away copies of his "new" album to any fan who donated through GoFundMe.  As Better Noise Music had repeatedly told Vext, he did not, and does not, have the right to sell or otherwise distribute copies of this "new" album, recordings recorded during his time with Bad Wolves, or any other "solo" recordings without Better Noise Music's express consent.

79.     On information and belief, GoFundMe received notice through its fraud reporting services that Vext's GoFundMe page was fraudulent and misleading donors.  As a result, Vext's GoFundMe page was taken down.

80.     In addition to his unfair competition and bad faith conduct, Vext is defaming Kovac and Better Noise Music.  On the "Pardon My American" podcast, Vext falsely and maliciously stated that Kovac "is basically the Harvey Weinstein of rock and roll, but instead of

raping girls he rapes artists."  On that podcast, and in public performances posted on social media, Vext also uses the n-word to refer to Kovac.

81.     His comments are calculated to impose the greatest amount of harm possible to Kovac and his label to gain leverage in his dispute with Plaintiffs regarding the parties' rights under the Agreements.  Vext's conduct and defamatory statements evidence the fact that he is acting in bad faith with an intent to injure.

## FIRST CAUSE OF ACTION

### (Copyright Infringement)

### (*By Better Noise Music against Vext*)

82.     Plaintiffs repeat each and every allegation in paragraphs 1 through 81 above with the same force and effect as if fully set forth herein.

83.     Pursuant to Section 13 of the Recording Agreement, Better Noise Music is the exclusive copyright owner of the master sound recordings "Better Off That Way" and the Cover Songs.

84.     Better Noise Music has registered its copyrights in those recordings with the U.S. Copyright Office and has received registration numbers as set forth above.

85.     Pursuant to the U.S. Copyright Act, 17 U.S.C. §§ 106, *et seq.*, as the exclusive copyright owner, Better Noise Music has the exclusive right to reproduce these recordings in copies or phonorecords, to prepare derivative works based upon these recordings, to distribute copies or phonorecords of the recordings and to perform the recordings publicly by means of digital audio transmission.

86.     Vext's unauthorized copying, publication and distribution of the master sound recordings in "Better Off This Way" and the Cover Songs have infringed, and continue to infringe, Better Noise Music's copyrights under 17 U.S.C. §§ 106, *et seq.*

87.     Vext's actions constitute willful copyright infringement.

88.     Better Noise Music has suffered damages as a result of Vext's infringement in an amount that will conform to proof at trial.  Better Noise Music seeks to recover its actual damages and any and all profits Vext received as a result of his infringing conduct per 17 U.S.C. § 504(a)(1); but Better Noise Music reserves the right to elect to recover statutory damages, including enhanced statutory damages as a result of Vext's willful infringement.

89.     Better Noise Music is entitled to, and seeks, its costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

90.     Better Noise Music also puts Vext on notice that, should he continue to publish or otherwise use Better Noise Music's copyrighted recordings, Better Noise Music may suffer irreparable harm in connection with the release of Bad Wolves' third album as its damages may be incalculable.  As a result, Better Noise Music reserves the right to seek temporary, preliminary and permanent injunctive relief to stop Vext's further infringements.

## SECOND CAUSE OF ACTION

### (Breach of the Recording Agreement)

### (*By Better Noise Music against Vext*)

91.     Plaintiffs repeat each and every allegation in paragraphs 1 through 90 above with the same force and effect as if fully set forth herein.

92.     On August 31, 2017, Better Noise Music and Vext executed the Recording Agreement, which is a valid, binding and enforceable contract.

93.     Better Noise Music has fully performed its contractual obligations to Vext under the Recording Agreement, and any obligations not performed are excused due to Vext's prior material breaches or otherwise.

94.     Vext has materially breached the Recording Agreement by, among other things,

recording music for others in violation of the exclusive recording restriction in Section 1.

95.     Vext also materially breached the Recording Agreement by using and distributing Better Noise Music's property, including but not limited to, its master recordings and music videos, without Better Noise Music's consent.

96.     Vext has also repudiated his obligations under the Recording Agreement as evidenced by his statements on the "Gut Check Uncut" and "Pardon My American" podcasts in August 2021.

97.     Better Noise Music is entitled to treat Vext's statements as a repudiation of his obligations.

98.     Better Noise Music has been damaged, and will continue to be damaged, by reason of Vext's material breaches of the Recording Agreement and by his repudiation of his obligations under the Recording Agreement.

99.     Vext agreed in Section C-8 of the Recording Agreement that his services are "of a special, unique and intellectual character which gives them peculiar value, and that in the event of a breach by [Vext] of any term, condition or covenant hereof, [Better Noise Music] may be caused irreparable injury."

100.    Vext's conduct is causing and, unless enjoined by this Court, will continue to cause Better Noise Music irreparable injury that cannot fully be compensated or measured in money damages.  Better Noise Music is therefore entitled to temporary, preliminary and permanent injunctive relief prohibiting Vext from further violating its rights under the Recording Agreement.

**THIRD CAUSE OF ACTION**

**(Breach of the Publishing Agreement)**

**(*By 5-19 against Vext*)**

101.    Plaintiffs repeat each and every allegation in paragraphs 1 through 100 above with the same force and effect as if fully set forth herein.

102.    On August 31, 2017, 5-19 and Vext executed the Publishing Agreement, which is a valid, binding and enforceable contract.

103.    5-19 has fully performed its contractual obligations to Vext under the Publishing Agreement, and any obligations not performed are excused due to Vext's prior material breaches or otherwise.

104.    Nevertheless, Vext has materially breached the Publishing Agreement by, among other things, publishing music in breach of his agreement to use 5-19 as his exclusive music publisher.

105.    Vext also materially breached the Publishing Agreement when he deprived 5-19 of the rights to any new musical compositions.

106.    Vext has also repudiated his obligations under the Publishing Agreement as evidenced by his statements on the "Gut Check Uncut" and "Pardon My American" podcasts in August 2021.

107.    5-19 is entitled to treat Vext's statements as a repudiation of the Publishing Agreement.

108.    5-19 has been damaged, and will continue to be damaged, by reason of Vext's material breaches of the Publishing Agreement and by his repudiation of his obligations under the Publishing Agreement.

109.    Vext's conduct was a foreseeable and proximate cause of 5-19's damages, the amount of which shall be determined at trial.

110.    Vext's conduct is also causing and, unless enjoined by this Court, will continue to cause 5-19 irreparable injury that cannot fully be compensated in money damages.  5-19 is

entitled to temporary, preliminary and permanent injunctive relief prohibiting Vext from further violating its rights under the Publishing Agreement.

## FOURTH CAUSE OF ACTION

### (Breach of the Management Agreement)

### (*By 10th Street Entertainment against Vext*)

111.    Plaintiffs repeat each and every allegation in paragraphs 1 through 110 above with the same force and effect as if fully set forth herein.

112.    On August 31, 2017, 10th Street Entertainment and Vext executed the Management Agreement, which is a valid, binding and enforceable contract.

113.    10th Street Entertainment has fully performed its contractual obligations to Vext under the Management Agreement, and any obligations not performed are excused due to Vext's prior material breaches or otherwise.

114.     Vext materially breached the Management Agreement by refusing to pay 10th Street Entertainment management commissions that are due and owing.

115.    10th Street Entertainment has been damaged, and will continue to be damaged, by reason of Vext's material breaches of the Management Agreement.

116.    Vext's conduct was a foreseeable and proximate cause of 10th Street Entertainment's damages, the amount of which shall be determined at trial.

## FIFTH CAUSE OF ACTION

### (Violation of Lanham Act, 15 U.S.C. § 1125(a))

### (*By Plaintiffs Against Vext*)

117.    Plaintiffs repeat each and every allegation in paragraphs 1 through 116 above with the same force and effect as if fully set forth herein.

118.    Vext's use of the Bad Wolves name, including confusingly similar variations of

that name, as alleged herein violates Section 43(a) of the Lanham Act, codified at 15 U.S.C.

§ 1125(a).

119.    Vext's use of his name, image and likeness to promote his "new" songs and

"new" band, as alleged herein, also violates Section 43(a) of the Lanham Act, codified at 15

U.S.C. § 1125(a).

120.    Plaintiffs have the right to use the name "Bad Wolves" to market and promote

music under the Recording Agreement and to exploit compositions under the Publishing

Agreement.  10th Street Entertainment also collects management commissions based on such

exploitation.

121.    Plaintiffs have been harmed as result of Vext's violations of 15 U.S.C. § 1125(a)

because, without limitation, Vext's conduct creates consumer confusion, undermines Plaintiffs'

rights under the contracts and deprives Plaintiffs of the rights to enjoy the benefits of those

contracts.  Vext's misconduct impermissibly draws fans and customers away from Plaintiffs and

towards his unapproved content, and impairs the value of the licenses Plaintiffs enjoy.

122.    Plaintiffs' damages are significant and will conform to proof at trial.  Plaintiffs

also seek disgorgement of Vext's profits, costs and attorneys' fees pursuant to 15 U.S.C.

§ 1117(a).

123.    Vext's conduct is also causing and, unless enjoined by this Court, will continue to

cause irreparable injury that cannot fully be compensated in money damages.  Plaintiffs are

entitled to temporary, preliminary and permanent injunctive relief prohibiting Vext from further

violations of 15 U.S.C. § 1125(a).

## SIXTH CAUSE OF ACTION

### (Unfair Competition)

### (*By Better Noise Music and 5-19 against Vext*)

124.    Plaintiffs repeat each and every allegation in paragraphs 1 through 123 above with the same force and effect as if fully set forth herein.

125.    As alleged herein, Vext is engaging in a retaliatory scheme that is calculated to harm Plaintiffs.  His conduct is commercially unreasonable, immoral and in bad faith.

126.    As shown by his recent promotional materials, he is intentionally using a name for his new musical group—"Tommy Vext and the B@D W8LV3S"—that is confusingly similar to the name Bad Wolves that Plaintiffs have a right to use to market and promote authorized sound recordings, videos, compositions and other such music assets.

127.    Through these and other promotional materials, Vext is passing off himself and his new group as the authorized version of Bad Wolves.  Vext is also misappropriating the results of the skill, expenditures and labor that Plaintiffs invested into Bad Wolves.  Vext is engaging in this conduct in bad faith.

128.    As a result of Vext's unfair competition, Plaintiffs have been harmed in an amount which will conform to proof at trial.  Plaintiffs are also entitled to punitive damages as a result of Vext's malicious, intentional, reckless, and wanton conduct.

129.    In addition, Vext's unfair competition is also causing and, unless enjoined by this Court, will continue to cause irreparable injury that cannot fully be compensated in money damages.  Plaintiffs are therefore entitled to temporary, preliminary and permanent injunctive relief prohibiting Vext from further acts of unfair competition.

### SEVENTH CAUSE OF ACTION

**(Declaratory Judgment)**

**(*By Plaintiffs Against Vext*)**

130.    Plaintiffs repeat each and every allegation in paragraphs 1 through 129 above with the same force and effect as if fully set forth herein.

131.    An actual and justiciable controversy exists between Plaintiffs and Vext regarding their rights and obligations under the Recording Agreement, Publishing Agreement and Management Agreement.

132.    Plaintiffs contend that they have the right to use the name Bad Wolves in connection with recording of new music for the Band; shooting new music videos for the Band; creating other such assets for the Band; and marketing and promoting new and existing sound recordings, videos and other such assets.

133.    The Agreements grant Plaintiffs broad authority and discretion to use the Bad Wolves name, and other intellectual property, in furtherance of the purposes of the respective Agreements.  For example:

(a)    The Recording Agreement permits Better Noise Music to use the Bad Wolves name, and other intellectual property, in connection with album recordings, music videos and photos, websites, social media channels, and merchandising (*see, e.g.,* Recording Agreement, §§ 1, 3, 7, 8, and 9);

(b)    The Management Agreement permits 10th Street Entertainment to use the Bad Wolves name, and other intellectual property, for publicity, advertising, promotion, personal appearances, and performances (*see, e.g.,* Management Agreement, § 3); and

(c)    The Publishing Agreement permits 5-19 to administer, control, use, exploit, and otherwise deal in and for the Bad Wolves name and other intellectual property, *to wit*, musical compositions (*see, e.g.,* Publishing Agreement, §§ 1 and 2).

134.    Vext disagrees, and claims that, despite these contract provisions, he has the right to approve any and all uses of the name Bad Wolves and that Plaintiffs are violating his rights by

using the name.  Plaintiffs seek declaratory relief to resolve this dispute.

135.    Plaintiffs also contend that Vext is currently bound by exclusive recording restrictions in the Recording Agreement and exclusive publishing restrictions in the Publishing Agreement, but Vext disagrees.  Plaintiffs seek declaratory relief to resolve this dispute.

136.    Plaintiffs also contend that Vext has no right to use, display or otherwise exploit the sound recordings, music videos and other such assets owned by Plaintiffs pursuant to the Recording Agreement.  Vext disagrees, and claims that he is the owner of these assets and has the right to use them without Plaintiffs' permission.  Plaintiffs seek declaratory relief to resolve this dispute.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment and relief against Vext as follows:

A.      A judgment in Plaintiffs' favor on Plaintiffs' Causes of Action;

B.      An injunction barring Vext and his respective agents and all those who act in concert with them from: (i) using, displaying, or in any manner exploiting, the Bad Wolves' name or any confusingly similar name; (ii) recording, performing for the purpose of recording, or rendering services in connection with the recording of, any music unless expressly permitted by the terms of the Recording Agreement; (iii) leaking, releasing, or otherwise disseminating any previously unreleased music to the public or third parties absent Plaintiffs' written consent; (iv) releasing or otherwise disseminating any new music to the public or third parties absent Plaintiffs' written consent; (v) manufacturing, causing to be manufactured, offering for sale, or selling recordings derived, in whole or in part, from Vext's performances; and (vi) entering into any agreement with respect to merchandising or marketing of Vext, which would be inconsistent with or in violation of the terms of the Agreements;

C.      Damages, including punitive damages on the unfair competition claim, in an

amount to be proven at trial;

       D.     Pre-judgment and post-judgment interest to the extent permitted by law;

       E.     The costs of this action;

       F.     Attorneys' fees and costs pursuant to 17 U.S.C. § 505 and 15 U.S.C. § 1117(a);

and

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

G.  Such other relief as the Court may deem just and proper.


DATED:  August 20, 2021
Los Angeles, CA

MILLER BARONDESS, LLP


By: */s/Lauren M. Brody*
Lauren M. Brody
lbrody@millerbarondess.com
A. Sasha Frid (*Pro Hac Vice Forthcoming*)
sfrid@millerbarondess.com
David W. Schecter (*Pro Hac Vice Forthcoming*)
dschecter@millerbarondess.com
1999 Avenue of the Stars, Suite 1000 Los Angeles, California 90067
(310) 552-4400

*Attorneys for Plaintiffs*